ENTERED

NOV 21 2002

DISTRICT OF CALIFO

JS-6

FILED
CLERK US DISTRICT COURT

FILED

NOV 21 2002

CENTRAL DISTRICT OF CALIFORNIA
BY                                          DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

URI GELLER, et al.,

               Plaintiffs,

vs.

NINTENDO CO., LTD., et al.,

               Defendants.

         **CV 00-11626 FMC (MANx)**

         **ORDER GRANTING
         DEFENDANTS' MOTION TO
         DISMISS**

     This matter is before the Court on Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction (docket # 64). This matter was heard on October 28, 2002, at which time the parties were in receipt of the Court's tentative order. For the reasons stated below, Defendants' Motion is hereby granted.

## I. Background

     The present action for trademark violations arises out of a likeness and name appearing on a Japanese-language Pocket Monster card ("Japanese-language Pokémon card"). The issue presented in the present Motion is whether the Court has subject matter jurisdiction over these claims.

80

## A.     The Parties

Plaintiff Uri Geller ("Geller") is an entertainer, author, radio personality, and teacher, who demonstrates the power of the human mind to entertain and teach others. (Compl. ¶ 11). Geller has often demonstrated to audiences his ability to bend spoons with the power of his mind. (Compl. ¶ 12). Geller is a citizen of Israel and the United Kingdom and resides in the United Kingdom. (Compl. ¶ 3). Plaintiff Sambracal AG ("Sambracal")[1] is a Liechtenstein Corporation with a principal place of business in Liechtenstein. Sambracal employs Geller, and Geller has granted Sambracal the rights to use his name and likeness. (Compl. ¶¶ 4, 16).

Defendant Nintendo Co., Ltd., ("NCL") is a Japanese corporation with a principal place of business in Kyoto, Japan. (Compl. ¶ 5).

Defendant Nintendo of America, Inc. ("NOA")[2] is a Washington corporation with a principal place of business in Redmond, Washington. (Compl. ¶ 6).

## B.     Nintendo's Marketing of Pokémon Products

Plaintiffs allege that Nintendo is the creator, manufacturer, distributor, and master licensor of the Pokémon line of children's products. (Compl. ¶ 20). These products are based on a group of fictional characters that possess a variety of different powers. *Id.* Central to the Pokémon concept are the trading cards (similar to baseball cards) that are used to play a card game. (Compl. ¶ 20-21). The game requires the purchase and collection of as many different cards as possible, and Pokémon products are marketed under a slogan of "Gotta catch 'em all!" (Compl. ¶ 21). Each card features a depiction

---

[1] Collectively, Geller and Sambracal are referred to as "Plaintiffs."

[2] Collectively, Nintendo Co. and Nintendo of America are referred to as "Nintendo."

1 of a fictional character, provides a description of the character's powers, and
2 provides other information relevant to the card game. (*See e.g.*, Compl., Exh.
3 6). Nintendo packages cards randomly and manufactures lower quantities of
4 some cards than others so that consumers must purchase a number of
5 different packs of cards to acquire those they specifically seek. (Compl. ¶ 21).

6
7 **C.    Additional Facts Offered by Nintendo**

Nintendo provides additional facts regarding the marketing of the
8 Pokémon products. The Pocket Monster concept (which later evolved into
9 what is marketed as Pokémon in the United States) was originally developed
10 by Game Freak, Inc., a Japanese corporation, as a video game to be played on
11 Nintendo's Game Boy hand-held video game system. Creatures, Inc., a
12 Japanese corporation, assisted in developing this concept.

13      The Japanese Pokémon card game was developed by Creatures and
14 commercially introduced in Japan in 1996. The original artwork for the cards
15 was created by Game Freak and Creatures, and Nintendo had no role in
16 designing these cards.

17      Creatures, in October 1996, granted an exclusive license to Media
18 Factory, a Japanese corporation, to manufacture and distribute the Japanese
Pokémon card game in Japan. Nintendo Co. became Media Factory's
19 manufacturer and received a fee for its services. Nintendo Co. is not a licensor
20 of, and has not received any royalties from, the sale of Japanese-language
21 Pokémon cards. This distribution has been handled by Media Factory until
22 October 2000, and since then by the Pokémon Company, a Japanese
23 corporation.

24      In 1998, Nintendo of America became the exclusive licensee for
25 "localized versions" of Pokémon products in the western hemisphere. Many
26 of the names of the Pokémon characters were changed when marketed in the

United States.[3]  Nintendo of America granted a license to Wizards of the Coast, Inc., a Washington corporation, to manufacture and distribute English-language Pokémon cards in the United States.  NOA is not involved in any way in the manufacture or distribution of any Japanese Pokémon products.

Neither Nintendo Co. nor Nintendo of America sells or distributes Japanese-language Pokémon cards in Japan or the United States.  Media Factory and The Pokémon Company do not distribute Japanese-language Pokémon cards in the United States.  Nonetheless, Japanese-language Pokémon cards have found their way into the United States market as the result of the actions of third parties, unknown to and unaffiliated with Nintendo Co. or Nintendo of America, who purchase Japanese-language Pokémon cards in Japan and import them into the United States for resale.  Since the fall of 1999, Japanese-language Pokémon cards have been marked with a notice: "For sale in Japan only."

**D.   Japanese Pokémon Card Number 64**

One Japanese-language Pokémon card, designated number 64, is at issue in this action.  The card is written in the Japanese language and alphabet. (Compl. ¶ 23).  The character's name is pronounced either "Yun Geller"[4] or júngera.[5]  The character's name as written in Japanese katakana letters is

---

[3] In the United States, character 64 has been rechristened "Kadabra", and is in a series of characters named "Abra," "Kadabra," "Alakazam."

[4] This is Plaintiff's version.

[5] This is Nintendo's version.  Nintendo's official Pokémon website, <<www.pokemon.com>>, provides yet another version of the pronunciation of this character.  A comparison chart of the names of Pokémon characters in English, German, French, and Japanese notes that the Japanese character 64's name is "YUNGERER." Nintendo has recently deleted the link from its website to the Pokémon website, and has noted in its reply that the link was a "news story" regarding a promotion of Pokémon products in

remarkably similar to Uri Geller's name.[6]  The Pokémon character ("Japanese Pokémon character 64")  is described as a psychic possessing the power to give others headaches by emitting "alpha waves" and is depicted holding a bent spoon.  (Compl. ¶ 23).  The similarity of the character's name to Uri Geller's name, as well as the character's depiction with a bent spoon, has led to the present action.

**E.    Plaintiffs' Evidence**

Plaintiff presented the following evidence.

Nintendo of America ("NOA") is the wholly-owned subsidiary of Nintendo Co., Ltd. ("NCL"), and NOA is NCL's headquarters for operations in the Western Hemisphere.  NOA is the exclusive licensee of Pokémon products in the United States.

NCL and NOA share an English-language website and issue consolidated financial statements.

NOA was responsible for changing the character names on the English-language version of Pokémon products for sale in the United States.  One reason for changing the name of character 64 was due to "trademark" considerations.

A magazine published specifically for Pokémon enthusiasts in the United States features Japanese-language Pokémon cards.[7]

A domestic licensee for Pokémon trading cards publishes "universal"

---

Germany.

[6] *See* Compl., Exh. 1. Plaintiffs allege that Uri Geller's first name consists of two letters, and that the character's first name also consists of two letters, the first of which is identical to that of "Uri." Plaintiffs also allege that Uri Geller's last name consists of three characters and is identical to the last name of the character depicted on card 64.

[7] There is no evidence that this magazine is published by any entity affiliated with Defendants. Indeed, on its cover, the magazine disclaims any affiliation with NOA.

1 game rules for playing the game with cards in different languages, specifically

2 including Japanese and English.[8]  Plaintiff has also presented evidence that at

3 least one licensed Pokémon product in Japan encourages collection of

4 Pokémon game-playing cards in languages other than Japanese.

5    Plaintiffs have presented evidence that on April 3, 2001, over 1,000

6 matches to the search "Japanese Pokémon" were found on <<ebay.com>>,

and that this same search yielded 822 matches on September 1, 2002.

7    Plaintiffs present no evidence that Defendants have purposely imported

8 Japanese-language Pokémon cards into the United States.  Rather, Plaintiffs

9 merely argue that the importation and sale of these cards occur.  Plaintiffs also

10 argue that Defendants have failed to make efforts to prevent the sale of these

11 products in the United States.

12

13 **F.    Plaintiffs' Claims**

14    Plaintiffs allege two violations of the Lanham Act, as well as a number

15 of state law causes of action.  First, Plaintiffs allege unfair competition

16 pursuant to 15 U.S.C. § 1125(a).  Plaintiffs allege that the use of Japanese

17 Pokémon character 64's name and its depiction with a bent spoon is likely to

18 1) cause confusion or mistake or to deceive the public as to the existence of an

affiliation, connection, or association between Nintendo and Plaintiffs, or 2)

19 cause the public to erroneously believe that Nintendo's goods are sponsored,

20 approved, or endorsed by Plaintiffs. (Compl. ¶ 34).

21    Second, Plaintiffs allege trademark dilution pursuant to 15 U.S.C. §

22 1125(c).  Plaintiffs allege that the distinctive and famous mark "Uri Geller"

23 has been diluted by Nintendo's use of the mark, and that Nintendo's use of

24 the mark began well after the mark became famous.  (Compl. ¶¶ 41-42).

25

26    [8] There is no evidence that Defendants have authorized or encouraged this practice.

6

G.    **The Original Motion**

A Motion to Dismiss based on lack of subject matter jurisdiction was originally filed by Nintendo on January 17, 2001.  Specifically, Nintendo argued that extraterritorial application of the Lanham Act to Plaintiffs' claims is inappropriate.  Additionally, Nintendo argued that, in the absence of federal question jurisdiction, the Court lacked subject matter jurisdiction over the Plaintiffs' state law claims.

Plaintiffs argued that the application of the Lanham Act to their claims would not amount to an extraterritorial application of the Act, and that, in any event, such an application is appropriate.  Plaintiffs also sought more discovery prior to the Court's ruling on the Motion to Dismiss.  The Court granted the Plaintiffs' request for discovery, and denied the original motion without prejudice.

After discovery, Defendants have again moved to dismiss.


### III. Extraterritorial Application of Lanham Act

A.    **General Rule**

Extraterritorial application means simply the application of the Lanham Act to actions carried on in another country.  In order to apply the Lanham Act to foreign commerce "first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority." *Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir.1985) (citing *Timberlane Lumber Co. v. Bank of America Nat'l Trust and Svgs. Ass'n*, 549 F.2d at 613-15).  The third element involves seven factors: "[1] the degree of conflict with foreign law or policy, [2] the nationality or allegiance of the

1  parties and the locations or principal places of business of corporations, [3]

2  the extent to which enforcement by either state can be expected to achieve

3  compliance, [4] the relative significance of effects on the United States as

4  compared with those elsewhere, [5] the extent to which there is explicit

5  purpose to harm or affect American commerce, [6] the foreseeability of such

6  effect, and the [7] relative importance to the violations charged of conduct
   within the United States as compared with conduct abroad." *Id.*

7      The Ninth Circuit has held that before dismissing an action that

8  involves extraterritorial application of the Lanham Act for lack of subject

9  matter jurisdiction, the Court must first determine whether the motion to

10 dismiss is properly brought pursuant to Fed. R. 12(b)(1) or whether the

11 motion is more properly treated as a motion for summary judgment.  In

12 certain instances, the resolution of a Rule 12(b)(1) motion must inquire into

13 the merits of the claim; the issues of the court's subject matter jurisdiction

14 would then be intertwined with the merits of the claims raised, and the

15 plaintiff must be afforded an opportunity for discovery prior to the court's

16 resolution of the motion to dismiss.  *See Timberlane*, 749 F.2d at 1382 n.1

17 ("We do not believe that all cases deciding the question of extraterritorial
   jurisdiction should be decided under Rule 12(b)(1).")

18     The Ninth Circuit has noted that the first two elements of the

19 *Timberlane* test implicate a consideration of the merits, but that when

20 dismissal is appropriate under the third element, no such inquiry is required.

21 Therefore, the Court first considers the third element of the *Timberlane* test.

22

23 **A.    The Third Element of the *Timberlane* Test**

24     **1.    The degree of conflict with foreign law or policy**

25     This factor focuses on whether there is a potential conflict (as when the

26 laws of the United States and the foreign country contradict one another) or

1  an actual conflict (as when there is a pending proceeding in the foreign
2  country).  Assessment of whether this factor supports extraterritorial
3  application of the Lanham Act requires a review of Ninth Circuit case law
4  examining this issue, as well as a comparison of Japanese and United States
5  trademark laws.

6       In *Timberlane*, the United States noted a conflict (i.e., a contradiction)
7  between Honduran law, which permitted business combinations and
8  agreements restraining trade, and United States' antitrust laws, which
9  prohibit such restraints on trade.  This conflict led the court to conclude that
10  enforcement of the United States antitrust laws would lead to a significant
11  conflict with Honduran law and policy, and therefore, this factor weighed
   strongly in favor of dismissal.  *Timberlane*, 748 F.2d at 1384.

12       In *Ocean Garden*, 953 F.2d 500 (9th Cir. 1991), the court held that there
13  was no conflict where there were no pending proceedings in the foreign
14  country.  *Accord, Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp.2d 1120 (C.D.
15  Cal. 1998).  Conversely, in *Star-Kist*, the Court held that there was a potential
16  conflict with a foreign country's laws where there was a pending proceeding in
17  the foreign country to cancel the foreign registration of the trademark at issue
18  in the action.  *Star-Kist*, 769 F.2d at 1396.

19       In *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552 (9th Cir.
20  1992), the court noted that the existence of foreign proceedings could weigh in
21  favor of extraterritorial application of the Lanham Act given the common
22  interest of Mexico and the United States in preventing trademark violations.
23  Implicit in this observation is that Mexico's and the United States' trademark
24  laws are similar.  In any event, the *Reebok* court noted that the pending
25  proceedings did not weigh strongly against  territorial application of the
   Lanham Act.

26       From these cases, it is clear that the Court is required to determine if

1   there are pending proceedings in a foreign country, and to compare the laws
2   of the foreign country to the United States to determine if there is a conflict
3   that could arise from the extraterritorial application of the Lanham Act.
4   Pursuant to the Court's order, the parties provided additional briefing
5   regarding Japan's laws on trademark infringement.  Nintendo provided a
6   summary of these laws, and, for purposes of the present Motion, Plaintiff
    agrees with Nintendo's summary.
7
8           Japan's trademark law protects trademarks that are registered in Japan.
9   The parties agree that Plaintiff has no trademark that is registered in Japan,
    and therefore has no cause of action under Japan's trademark law.  Japan's
10  Unfair Competition Prevention Law, however, protects unregistered
11  trademarks that are "widely recognized" or "well known."  A foreign
12  defendant may seek relief in a Japanese court for infringement by Japanese
13  parties of an unregistered trademark under the Unfair Competition
14  Prevention Law.
15          Plaintiff's trademark is also not registered in the United States;
16  however, Plaintiff claims to possess a common law trademark.  Unregistered
17  trademarks are protected by the Lanham Act,[9] but owners of unregistered
18  trademarks must first establish that their marks are protectable, and they do
    not enjoy the presumption of validity conferred upon registered marks.
19  Registration is prima facie evidence of the mark's validity, constitutes
20  constructive notice of the mark's ownership, and, in some instances, results in
21  incontestable status for the owner.  *See* 15 U.S.C. §§ 1057(b), 1065, 1072.
22          To establish a claim for trademark dilution in the United States,
23
24  ───────────────
        [9] *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S. Ct. 2753 (1992) (holding
25  that qualifying unregistered trademarks are protected under § 43(a) (15 U.S.C. § 1125(a)) of the
    Lanham Act); *Gazette Newspapers, Inc. v. The New Paper, Inc.*, 934 F. Supp. 688 (D. Md. 1996)
26  (applying *Two Pesos* to dilution claims under § 43(c) of the Lanham Act).

Plaintiff must establish that (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the plaintiff's mark became famous; and (4) the defendant's use presents a likelihood of dilution of the distinctive value of the mark. *Avery Dennison Corp. V. Sumpton*, 189 F.3d 868 (9th Cir. 1999); *Cairns v. Franklin Mint Co.*, 24 F. Supp.2d 1013 (C.D. Cal. 1998). Similarly, to establish an unfair competition claim under section 43(a) of the Lanham Act, a plaintiff must establish that a defendant is using a mark confusingly similar to its valid, protectable trademark. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999).

The Court concludes that the Plaintiff's burden under Japanese law is similar to that under United States law. Plaintiff must establish that his mark is well known or famous under Japanese law in order pursue his dilution claim in the United States. This requirement is expressed slightly differently in the context of the unfair competition claim under § 43(a) of the Lanham Act: Plaintiff must establish that defendant is using a mark confusingly similar to his trademark. To establish confusion, Plaintiff must first establish that his mark is famous or well-known. In the absence of knowledge of the mark, consumers will not become confused. Therefore, the Court concludes there is little conflict with Japanese law, and this factor weighs in favor of extraterritorial application of the Lanham Act.

### 2. The nationality or allegiance of the parties and the locations or principal places of business of corporations

In *Timberlane*, the court considered the citizenship of the parties and the residency of the witnesses. All but one of the parties were American, but all of the witnesses were foreign citizens. This led the court to the conclusion that this factor weighed slightly in favor of extraterritorial application of the

Lanham Act.  Defendants correctly argue that Nintendo of America is the only domestic party. Defendants also contend that Nintendo of America is *not* involved in any way with Japanese-language Pokémon cards.  In connection with the original motion to dismiss, Plaintiffs argued that they were entitled to additional discovery on this issue.  Now, at the close of discovery, Plaintiffs have presented additional facts that they argue support their position.

Plaintiffs have presented evidence that NOA is the wholly-owned subsidiary of NCL, that NOA is NCL's headquarters in the Western Hemisphere, that NOA and NCL share an English-language website and issue consolidated financial statements.  Plaintiffs have also established that NOA is the exclusive licensee of Pokémon products in the United States, and that NOA changed the name of character 64 for the English-language version of the Pokémon cards.  Additionally,  Plaintiff has presented evidence that Defendants maintained a website, <<pokemon.com>>, that (at some point in time) set forth a comparison chart of the names of Pokémon characters in the English, German, French, and Japanese languages.  Nevertheless, Plaintiffs have not established that NOA manufactures, imports, sells, or promotes the sale of Japanese-language Pokémon cards.

Case law makes clear that this factor does not weigh in favor of asserting jurisdiction over a foreign corporation simply because that foreign corporation has a domestic subsidiary.   For example, in *Vespa of America Corporation v. Bajaj Auto Limited*, 550 F. Supp. 224 (N.D. Cal. 1982), the court found that the nationality of the parties weighed against the extraterritorial application of the Lanham Act in a case where a domestic subsidiary and domestic distributor were joined as defendants.  The court found it significant that these domestic parties had only a "tangential interest in the foreign claims."

In contrast, the court in *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp.2d

1120 (C.D. Cal. 1998), found that the nationality of the parties weighed in favor of the extraterritorial application of the Lanham Act where domestic defendants were closely related to foreign defendants.  These entities were "closely related" because they were all owned by the same corporate entity and acted as each others' agents.

Here, the Court finds that there is insufficient evidence as to NOA's involvement in the manufacture, distribution, and importation of Japanese-language Pokémon cards to conclude that NOA has anything other than a tangential interest in the foreign claims.

This factor therefore weighs against the extraterritorial application of the Lanham Act.

### 3.   The extent to which enforcement by either country can be expected to achieve compliance

Defendant's summary of Japanese law[10] states that Japan would enforce a foreign judgment if it were consistent with Japanese law and public policy.  As noted above, Plaintiffs' burden of establishing their Lanham Act claims is similar under Japanese and United States law.  However, this summary also raises doubts as to whether a Japanese court would enforce a judgment by a United States Court against a party's conduct in Japan.  Plaintiffs have presented no evidence of Defendants' activities in the United States that refutes Defendant's evidence that it is not responsible for the importation of Japanese-language Pocket Monster cards.

It appears to the Court that this factor weighs against extraterritorial application of the Lanham Act.

---

[10] *See* Yoshida Declaration, Exh. 3(d).  This summary was filed with the Court on May 29, 2001, in response to the Court's order for additional briefing regarding matters of Japanese law.

4.   **The relative significance of effects on the United States as compared with those elsewhere**

Defendants have presented evidence that over nine million Japanese-language cards depicting character 64 have been manufactured. (*See* Yoshida Decl., Exh. 12). Plaintiffs have presented no evidence as to the number of Japanese-language cards depicting character 64 that have been imported into the United States.

Plaintiffs argue that it is too early in the proceedings to make any conclusions regarding this factor. However, Plaintiffs' argument ignores the fact that discovery on this issue is closed. The time for conclusions regarding this factor is now.

Plaintiffs also argue that the fact that Defendants have engaged in efforts to prevent importation of the Japanese-language Pokémon cards is evidence of the volume of sales in the United States. Plaintiffs point out that Defendants are unaware of the true volume of sales in the United States. Plaintiffs are similarly unaware.[11] As is this Court.

Absent evidence to the contrary, the Court has no difficulty in presuming that the vast majority of these cards have been sold in Japan, rather than the United States.[12]

This presumption is in accord with case law on this issue. In *Ocean*

---

[11] Plaintiffs have presented evidence that suggests that approximately 800 to 1000 Japanese-language Pokémon products are for sale on <<ebay.com>> at any given time. However, Plaintiffs have not presented evidence regarding the number of character 64 cards that are imported or sold in the United States. This case is not typical. Here, it is not that a trademark violation is alleged to occur every time a pack of Japanese-language Pokémon card is sold; rather, it is alleged that such a violation occurs only when a character 64 Japanese-language Pokémon card is sold.

[12] Defendants have also presented similar evidence regarding video games depicting character 64 that have been manufactured. Plaintiffs have presented no evidence that suggests that any of these video games have been imported into the United States.

1   *Garden*, the plaintiffs were aliens, not American citizens.  Therefore, the effect
2   on the United States was held to be not as great as it would have been if the
3   plaintiffs were domestic.  In *Timberlane*, the court held that the effect on the
4   foreign country was much greater than on the United States because the
5   lumber imports at issue were a minuscule portion of the total lumber.  Here,
6   it is clear to the Court that the effect on Japan is far greater than the effect on
    the United States.
7
        This factor weighs strongly against extraterritorial application of the
8   Lanham Act.
9

10      **5.    The extent to which there is explicit purpose to harm or affect
                American commerce**

11      There is no evidence that NOA or NCL intended that any Japanese-
12   language  Pokémon cards be imported into or sold in the United States.
13      Plaintiffs argue that the Ninth Circuit has held that evidence of a
14   defendant intentionally adopting another's mark may alone be sufficient
15   evidence that the defendant intended to harm or affect American commerce.
16   *See Ocean Garden*, 953 F.2d 500, 504, 507-08 (9th Cir. 1991).  Plaintiffs'
17   argument is not persuasive because there is no evidence here that Defendants
18   intentionally adopted Plaintiffs' mark.  In *Ocean Garden*, the Court held that
     evidence of a meeting in which a defendant met with an import/export
19   business regarding packaging of canned fish in packaging that closely
20   resembled a competitor's packaging constituted evidence that the competitor's
21   mark was intentionally adopted.  Here, there is evidence that Defendants
22   attempted to prevent the importation of the Japanese-language cards into the
23   United States.  The evidence also establishes that Defendants changed the
24   name of the English-language character 64 card before marketing the
25   Pokémon cards in the United States.  From this, the Court cannot infer the
26   same level of intent exhibited by the defendant in *Ocean Garden*.

1    This factor weighs strongly against the extraterritorial application of the
2    Lanham Act.

3

### 6.    The foreseeability of such effect

4
5    Because the Court does not conclude that the effect on commerce was
     intentional, the Court also does not conclude that the effect was foreseeable.
6    Plaintiffs argue that so long as Defendants have knowledge of Plaintiffs'
7    marks, their use of Plaintiffs' marks in commerce cause a foreseeable harm or
8    effect. Plaintiffs rely on *Winterland Concession Co. v. Fenton*, 835 F. Supp. 529,
9    531 (N.D. Cal. 1993). In *Winterland*, the Court applied the *Timberlane* factors
10   and concluded that, based on the defendant's knowledge of plaintiffs' marks,
11   their sale of unlicensed products in the United States caused a foreseeable
12   harm or effect on American commerce. Here, however, there is no evidence
13   that Defendants purposefully imported and sold Japanese-language cards
14   depicting character 64 in the United States. In fact, the evidence is to the
15   contrary. Defendants have attempted to prevent the sale of Japanese-language
16   cards in the United States.

17   Plaintiffs also argue that they seek to address continuing harm and that
18   because Defendants now know of the popularity of the Japanese-language
     cards, they cannot claim the harm is not foreseeable. There is a certain logic
19   to Plaintiffs' argument; however, adopting the application of this factor
20   advanced by Plaintiffs would render the factor largely meaningless. Parties
21   always learn more about the facts of a case after discovery. It seems to the
22   Court that Plaintiffs' argument is better suited toward the fifth factor,
23   regarding the actual harm or effect on commerce, rather than the sixth factor,
24   which addresses foreseeability.

25   This factor weighs against extraterritorial application of the Lanham
26   Act.

7.     **Relative importance to the violations charged of conduct within the United States as compared with conduct abroad**

In the context of this case, the Court can discern no distinction between this factor and the fifth factor, which is analyzed above, and which weighs against extraterritorial application of the Lanham Act.

In *Timberlane*, the court considered the location of alleged illegal conduct.  Because the alleged illegal conduct occurred in Honduras, the exercise of jurisdiction was held not to be appropriate.  Given the absence of evidence of manufacture or large-scale distribution in the United States of Japanese-language Pokémon cards, the Court concludes that the seventh factor also weighs against the extraterritorial application of the Lanham Act.

**C.     Weighing of Factors of Third Element of *Timberlane* Test**

All but one factor weigh against extraterritorial application of Lanham Act.  The Court concludes it has no jurisdiction.  Accordingly, the Court **hereby dismisses** Plaintiffs' Lanham Act claims.

# IV. State Law Claims

State law claims are before the Court pursuant to the Court's supplemental jurisdiction.  *See* 28 U.S.C. § 1367.  Pursuant to 28 U.S.C. § 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a plaintiff's state law claims when the district court has dismissed all claims over which it has original jurisdiction.  The Court has dismissed the federal claims and declines to exercise jurisdiction over the supplemental state law claims.

## V. Plaintiffs' Supplemental Evidence

On October 23, 2002, Plaintiffs filed supplemental evidence regarding Japanese-language Pokémon cards being sold in the United States. Promotional packages of Pokémon cards were purchased at a Target retail store, and feature a Japanese-language card in each pack.  The markings on the packages reveal that the packages were distributed by Excell Marketing. Defendants have filed declarations disavowing any relationship with Excell Marketing.

The Court agrees that this evidence adds little to the analysis.  There is still no evidence that NCL or NOA was involved in any manner in the importation of these cards.  Most importantly, however, there is still an absence of evidence that any Japanese-language Pokémon cards depicting character 64 have been imported by Defendants.

## VI. Conclusion

For the reasons stated above, the Court **hereby grants** Defendants' Motion  to Dismiss (docket #64).  Plaintiffs' first and second causes of action are **hereby dismissed with prejudice.**  Having dismissed Plaintiffs' federal claims, the Court declines to exercise jurisdiction over the remaining state law claims.  Accordingly, Plaintiffs' third through fifth causes of action are **hereby dismissed without prejudice.**

Dated:  November 20, 2002

FLORENCE-MARIE COOPER, Judge
UNITED STATES DISTRICT COURT